UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Severine Wamala,
        Plaintiff

        v.                                    Case No. 10-cv-87-SM
                                              Opinion No. 2011 DNH 017
Larry Blaisdell, Warden,
Northern New Hampshire
Correctional Facility,
        Defendant

**O R D E R**

In September of 2007, Severine Wamala was convicted of
eleven counts of aggravated felonious sexual assault upon his
then 14-year old daughter, J.W.  Wamala was sentenced to two
consecutive terms of ten to twenty years of imprisonment and, on
appeal to the New Hampshire Supreme Court, his convictions were
affirmed.  State v. Wamala, 158 N.H. 583 (2009).  Wamala now
seeks federal habeas corpus relief, asserting that his Fifth,
Sixth, and Fourteenth Amendment rights were violated during his
trial.  See Report and Recommendation (document no. 4) at 3-4
(construing petitioner's claims).  See generally 28 U.S.C. §
2254.

The State denies that any of Wamala's constitutional rights
were violated and moves for summary judgment.  For the reasons
discussed below, the State's motion is granted.

**Standard of Review**

I.   <u>Habeas Corpus Generally</u>.

Since passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), the power to grant federal habeas relief to a state prisoner with respect to claims adjudicated on the merits in state court has been substantially limited.  A federal court may not disturb a state conviction unless the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  And, a habeas petitioner seeking relief under that provision faces a substantial burden insofar as "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).

Alternatively, habeas relief may be granted if the state court's resolution of the constitutional issues before it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  <u>See also</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000).  The Supreme Court explained the distinction between decisions that are "contrary to" clearly established federal law,

and those that involve an "unreasonable application" of that law
as follows:

> Under the "contrary to" clause, a federal habeas court
> may grant the writ if the state court arrives at a
> conclusion opposite to that reached by [the Supreme]
> Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has
> on a set of materially indistinguishable facts.  Under
> the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies
> the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies
> that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13.  The Court also noted that an

"incorrect" application of federal law is not necessarily an

"unreasonable" one.

> The most important point is that an unreasonable
> application of federal law is different from an
> incorrect application of federal law . . . . Under §
> 2254(d)(1)'s "unreasonable application" clause, then, a
> federal habeas court may not issue the writ simply
> because that court concludes in its independent
> judgment that the relevant state-court decision applied
> clearly established federal law erroneously or
> incorrectly.  Rather, that application must also be
> unreasonable.

Id. at 410-11 (emphasis in original).


     Finally, it probably bears noting that a state court need

not rely upon, nor need it even cite, Supreme Court precedent in

order to avoid resolving a petitioner's claims in a way that is

"contrary to" or involves an "unreasonable application of" clearly established federal law.  See Early v. Packer, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases - indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original). In fact, even when a state court has summarily rejected a petitioner's federal claim without any discussion at all, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Harrington v. Richter, __ U.S. __, 2011 WL 148587 at *9 (Jan. 19, 2011).  Under those circumstances - that is, when "a state court's decision is unaccompanied by an explanation," - the habeas petitioner still bears the burden of "showing there was no reasonable basis for the state court to deny relief."  Id.

    Only as to federal claims that were not adjudicated on the merits by the state court, may this court apply the more petitioner-friendly de novo standard of review.  See, e.g., Clements v. Clarke, 592 F.3d 45 52 (1st Cir. 2010) ("In contrast, a state court decision that does not address the federal claim on the merits falls beyond the ambit of AEDPA.  When presented with

4

such unadjudicated claims, the habeas court reviews them de novo.") (citation omitted).

With those principles in mind, the court turns to Wamala's petition and the State's motion for summary judgment.

## Factual Background

Most of the relevant facts leading up to Wamala's arrest, as well as those concerning pre-trial motions practice and the criminal trial itself, are summarized (with record citations) in the State's legal memorandum (document no. 22-1) and Wamala's objection (document no. 26-1).  The parties are familiar with the relevant facts and those central to Wamala's habeas petition are not (or cannot reasonably be) disputed.  Accordingly, a lengthy recitation of the factual background is not necessary.  Those facts relevant to the disposition of this matter are discussed as appropriate.

## Discussion

As construed by the magistrate judge, Wamala's petition advances five properly exhausted claims:

1.   Wamala's Sixth and Fourteenth Amendment rights to a
     speedy trial were violated when, over Wamala's repeated
     assertions of his speedy trial rights and demands for a

speedy trial, he was subjected to a pretrial delay of twelve months, while he was detained awaiting trial, unable to post the $1,000,000 bail set by the trial court.

2.   Wamala's Fifth and Fourteenth Amendment rights to due process and equal protection were violated when he was denied attorney-conducted individual voir dire during the selection of his jury.

3.   Wamala's Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair trial were violated when the prosecutors in his criminal case engaged in overreaching by knowingly overstating the case against Wamala during trial.

4.   Wamala's Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair trial were violated when the trial judge allowed the prosecution to call witnesses at trial solely for the purpose of impeaching them with their prior inconsistent statements, that tended to inculpate Wamala, as a "mere subterfuge" to place otherwise inadmissible evidence in front of the jury.

5.   The trial court violated Wamala's Fifth, Sixth, and Fourteenth Amendment rights to due process, a fair trial, and to confront the evidence against him when it allowed evidence placed into a "time capsule" by J.W. to be admitted at trial as substantive evidence to rebut Wamala's charge that J.W. had fabricated the allegations against him.

Report and Recommendation (document no. 4) at 3-4.

Of those federal constitutional claims, one (claim 2) was specifically addressed by the New Hampshire Supreme Court, while two (claims 1 and 3) were summarily rejected as meritless. Those three claims are subject to AEDPA's deferential standard of review. See generally Harrington v. Richter, supra. The

remaining claims (4 and 5) were resolved on state evidentiary grounds and are, then, subject to de novo review.  In the end, however, regardless of whether Wamala's claims are subject to de novo or deferential review, the outcome is unchanged – he is not entitled to the habeas relief he seeks.

I.   <u>Claims Subject to De Novo Review</u>.

A.   Prosecutorial Misconduct (Claims 3 and 4).[1]

Wamala claims that his constitutionally protected rights to due process and a fair trial were violated when: (a) in its opening statement to the jury, the State repeatedly referred to three victims, when it well knew that J.W. was the only daughter who planned to testify against Wamala and that no inculpatory evidence would be offered as to the other two alleged victims; and (b) the State called Wamala's two other daughters – T.W. and L.W. – solely for the purpose of impeaching them.  <u>See</u> Habeas Petition (document no. 1-1) at 37.  The state supreme court described the relevant facts as follows:

> Both T.W. and L.W. told the police that the defendant had had sex with them.  The defendant, therefore, was

---

[1]    Although claim 3 is properly subject to AEDPA's deferential standard of review, it is so closely related to claim 4 (both deal with prosecutorial misconduct) that the court will discuss them together.  The benefit to Wamala, of course, is that the claim is subjected to the more petitioner-friendly de novo standard of review.

charged with one count of [aggravated felonious sexual
assault] and six counts of incest for acts involving
L.W., and five counts of incest for acts involving T.W.

Both L.W. and T.W. later recanted in interviews with an
investigator for the Public Defender.  The State called
both L.W. and T.W. as witnesses.  Both testified that
the defendant had never had sex with them, and the
State impeached them with their prior statements.  At
the close of the State's case, the court dismissed all
of the counts involving T.W. and all but one of the
counts involving L.W.  The jury acquitted the defendant
of the remaining count involving L.W.

State v. Wamala, 158 N.H. at 596 (citations omitted).


Wamala's point appears to be this: prior to calling T.W. and

L.W. to testify at his criminal trial, the State knew that both

girls would testify that he did not have sexual relations with

them.  Accordingly, says Wamala, the State necessarily called the

girls solely to elicit those exonerating statements in order to

then impeach them with their earlier inculpatory statements, made

to officers of the Nashua Police Department – highly prejudicial

statements that were otherwise inadmissible and that the jury

would not have heard, but for the State's wrongdoing.  See

generally Evans v. Verdini, 466 F.3d 141, 146 (1st Cir. 2006)

("[A] criminal prosecutor may not employ a prior inconsistent

statement to impeach a witness on a mere subterfuge or for the

'primary purpose' of placing before the jury substantive evidence

which is otherwise inadmissible.  Of course, there is no general

prohibition in the Constitution on a party impeaching its own
witness.  In criminal cases, however, such impeachment may
trigger Due Process and Confrontation Clause concerns.")
(citations and internal punctuation omitted).  But, Wamala's
constitutional claim is not borne out by the facts of the case.

A few days prior to trial, defense counsel informed the
State that T.W. and L.W. had given statements to a defense
investigator in which they denied that Wamala ever had sexual
relations with them.[2]  The State moved the court for a hearing,
at which both girls appeared with appointed counsel.  The State
noted that, because it had just learned that two of its three
victims/witnesses had given conflicting statements about Wamala's
sexual contact with them and because the girls refused to speak
with the prosecutors or their investigator, the State did not
know how the girls planned to testify at trial.  Consequently,
the State did not know whether it would be trying a case
involving one, two, or three victims; it did not know how to
prepare its other witnesses (e.g., the Nashua police officers);

---

[2]     According to Wamala, "on 11/21/2006, both TW and LW
recanted the false statements they had made at Nashua Police
Station."  Habeas Petition (document no. 1-1) at 30.  But, those
recantations were not provided to the prosecution until the day
on which the court was scheduled to draw the jury – August 20,
2007, nearly 10 months later.  See Transcript of Richards Hearing
at 14.

and, perhaps even more importantly, it did not know whether it should re-examine its case against Wamala and consider dropping some (or perhaps even all) of the charges against him.  See Transcript of Richards Hearing (August 20, 2007) at 17-21.[3]

At the hearing, both girls informed the court that: (1) they would not speak with the State about the charges pending against Wamala, nor would they discuss the allegations that he had sexual contact with them; (2) they did not want the assistance of appointed counsel; and (3) they understood they were under subpoena and would appear and testify truthfully at trial. Importantly, however, neither T.W. nor L.W. gave any indication as to how she would testify at trial (i.e., what she would say about the basic charge that she was sexually abused by Wamala). And, when the court presented L.W. with the opportunity to "say anything about whether [she] wish[ed] those [charges against Wamala] to go forward," she simply stated that she planned to

---

[3]    Although possible, it is unlikely that the State would have dropped the charges against Wamala relating to T.W. and L.W., given the evidence it had developed indicating that Wamala, and possibly L.W., had engaged in witness tampering (e.g., recorded jailhouse conversations in which Wamala told third parties to encourage the girls not to testify against him and how to explain away incriminatory statements they had made in their diaries about sexual contact with him, as well as "anonymous" communications - possibly authored by L.W. - directed to J.W. and encouraging her not to testify against Wamala at trial).  See, e.g., Transcript of Richards Hearing at 59-60.

testify truthfully at trial.  Transcript of <u>Richards</u> Hearing at 72.

Thus, as all acknowledged at the hearing, while the prosecution had recently learned that the girls had given conflicting statements about whether Wamala had sexual relations with them, it did <u>not</u> know how the girls planned to testify at trial.  <u>See, e.g.</u>, Transcript of <u>Richards</u> Hearing at 64 (The Court: "I don't know what happened, and it isn't up to me to know what happened.  And I don't know what's going to happen at trial and what these young ladies are going to say. . . . If it's helpful to the State, so be it.  And if it's helpful to the defendant, so be it.").  <u>See also</u> <u>id</u>. at 60-63, 66-68.

When the impeachment issue arose at trial, the court specifically asked defense counsel why he did not object to the State's calling T.W. and L.W. <u>before</u> they testified.  That is, if (as Wamala now suggests) everyone knew how the girls would testify at trial, and if defense counsel thought the State had called the girls solely to impeach them, the trial court wished to know why defense counsel failed to object until after the girls had given testimony favorable to Wamala.  <u>See</u> Trial Transcript, Day 2, at 71-75.  In response, defense counsel

11

conceded that even he did not know how the girls would testify at
trial.

>    **Defense Counsel**:  They [the State] knew there was an
>    issue that she may change her mind. . . .  We knew
>    there was an issue that she may change her mind.  If I
>    knew with 100 percent certainty, I would not be a
>    lawyer.  I would be a wealthy gambler.
>
>    **The Court**:  Oh, I understand, but what I'm saying is
>    this.  Let me accept that.  It sounds like that's
>    really what both of you are saying.
>
>    **Defense Counsel**:  That's exactly what we're both
>    saying.
>
>    **The Court**:  We didn't know [how either girl would
>    testify at trial].
>
>    **Defense Counsel**:  Yes.

Trial Transcript, Day 2, at 74-75.  <u>See also</u> Trial Transcript,
Day 4, at 121 (The prosecutor: "I think it's clear already, but
we obviously put [T.W.] and [L.W.] on, unsure of exactly what
they would say, but with a good faith basis to believe that there
was a chance they would testify to what they told the police,
which is what we consider to be the truth.").

   Given these facts, Wamala's constitutional claim simply
lacks merit.  There is no evidence in the record suggesting that
the State knew that, when placed under oath and called upon to
testify during a public trial, the girls would deny that Wamala

sexually assaulted them.  Nor is there evidence that the State called the girls as a "mere subterfuge" or for the "primary purpose" of getting before the jury otherwise inadmissible evidence (i.e., their statements to the Nashua Police Department that Wamala had been having sexual relations with them for a prolonged period of time).  See generally Evans, 466 F.3d at 146-47; United States v. Frappier, 807 F.2d 257, 259 (1st Cir. 1986).  Consequently, the State's decision to call the two girls as witnesses/victims to testify, and its subsequent decision to impeach their testimony with the statements they had given to the Nashua Police Department, did not unfairly prejudice Wamala.  Those decisions did not, under the circumstances, violate any of Wamala's constitutionally protected rights.

The same is true with respect to Wamala's claim that his constitutional rights were violated when the State engaged in "prosecutorial overreaching, by staging an unfair trial of 'three' alleged victims, when the prosecutor knew well in advance that there was only 'one' alleged victim."  Habeas petition at 29.  It is, as a factual matter, incorrect for Wamala to claim that, prior to trial, the State "knew" that L.W. and T.W. were not victims of Wamala's sexual assaults.  Consequently, the State did not engage in prosecutorial misconduct or improper "overreaching" when, in its opening statement, prosecutors told

13

the jury that the State would prove that Wamala victimized three, rather than only one, of his daughters.[4]

## B.   Evidence of J.W.'s "Time Capsule" (claim 5)

Next, Wamala claims that the trial court violated his federal constitutional rights to due process and a fair trial when it admitted into evidence J.W.'s "time capsule," which described how Wamala had sexually assaulted her when she was much younger.  The state court described the facts relating to the "time capsule" as follows:

> The "time capsule" was a sixth grade school project that required the victim to write information about herself on a piece of paper, seal the paper in an envelope, and open the envelope two years later.  On the paper, the victim wrote: "[S]omething about me that would surprise most people is ... I have sex with my father."  When the victim was in eighth grade, she opened the envelope and wrote: "I'm not a virgin or have a virgin mouth." She then resealed the envelope.
>
> Although the trial court had initially excluded evidence of the time capsule, after hearing the defendant's theory of the case and his testimony, the court allowed the State to: (1) call the victim as a

---

[4]    Wamala was charged with offenses relating to all three of his daughters, including one count of aggravated felonious sexual assault and six counts of incest involving L.W., and five counts of incest involving T.W.  Accordingly, the State tried to the jury a case involving three victims.  But, given the girls' actual testimony at trial, the court granted Wamala's motion for a directed verdict at to all counts involving T.W., and all but one of the incest counts involving L.W.  Trial Transcript, Day 4, at 126.  And, as to the one incest count involving L.W., the jury returned a verdict of not guilty.

rebuttal witness to testify about the time capsule as
well as about the prior uncharged assaults themselves;
and (2) introduce the time capsule into evidence as a
full exhibit.

* * *

After the defendant testified, the trial court ruled
that he had opened the door to evidence about the prior
uncharged assaults to which the victim's statements in
her time capsule referred.  The trial court ruled that
this evidence was admissible <u>to rebut the defendant's
claim that the victim had fabricated the allegations
against him</u>.  The court determined that even though
this was evidence of prior bad acts, it was admissible
under New Hampshire Rule of Evidence 404(b) and that
its probative value outweighed its potential prejudice
to the defendant.

Before allowing the victim to testify about the time
capsule, the trial court instructed the jury that her
time capsule statements were being admitted only to
rebut any suggestion that the defendant may have made
that she fabricated her allegations.  The court
admonished the jury that, to the extent that these
statements referred to any uncharged sexual assaults,
the jury could not use them as evidence of the
defendant's propensity to commit such assaults, "to
say, well, gee, if he committed some earlier offenses,
he must have committed these offenses."

<u>State v. Wamala</u>, 158 N.H. at 586-88 (citations omitted) (emphasis

supplied).


Invoking <u>Tome v. United States</u>, 513 U.S. 150 (1995), Wamala

asserts that the trial court erred in permitting the prosecution

to introduce J.W.'s "time capsule" into evidence.  He goes on to

claim that the admission of that evidence violated his

15

constitutionally protected rights to due process and a fair
trial.  The court disagrees.[5]

As the state supreme court correctly concluded, admission of
the "time capsule" evidence was within the trial court's sound
discretion and consistent with state evidentiary rules.  It would
also have been admissible under the Federal Rules of Evidence,
since: (1) the declarant (J.W.) "testifi[ed] at trial . . . and
[was] subject to cross-examination concerning the statement," and
(2) the statement was "consistent with the declarant's testimony
and [was] offered to rebut an express or implied charge against
the declarant of recent fabrication or improper influence or
motive."  Fed. R. Evid. 801(d)(1)(B).

Wamala's theory of the case, as expressed in counsel's
opening statement, was that J.W. fabricated the story of sexual

---

[5]      Parenthetically, the court notes that <u>Tome</u> stands for
ths basic proposition that out-of-court statements that <u>postdate</u>
a declarant's alleged motive to lie are not admissible under Rule
801(d)(1)(B).  <u>See</u> <u>Id</u>. at 167 ("Our holding is confined to the
requirements for admission under Rule 801(d)(1)(B).  The Rule
permits the introduction of a declarant's consistent out-of-court
statements to rebut a charge of recent fabrication or improper
influence or motive only when those statements were made before
the charged recent fabrication or improper influence or
motive.").  The Court did not address the constitutional
implications of a trial court's erroneous decision to admit
evidence under that rule.

assaults committed by her father on September 11, 2006, when
Nashua police officers were called to the family's home.

> At this point there's an opportunity – there's an
> opportunity for them [i.e., J.W. and her brother] to
> get out of the house, for them to stay together and for
> them to have more freedom and a life that they think is
> what a teenager should have.  They can drive.  [J.W.
> and her brother] had the perfect chance, and [J.W.]
> tells Officer Nadworny that her father assaulted her.
> And at that point the machinery of the police
> department goes into high gear.

Defendant's Opening Statement, Trial Transcript, Day 1 at 74-75.

That "opportunity to get out of the house" and to have the

freedom they sought, given their ability to drive, did not exist

when J.W. was in grammar school.  Plainly, then, the statements

in J.W.'s "time capsule" preceded, by several years, the point at

which Wamala claimed she fabricated the charges against him.

Wamala's assertion that the "time capsule" was not admissible

under Rule 801 because it was not created prior to the point in

time at which she acquired a motive to fabricate the story is

simply inconsistent with the factual record and with his own

arguments to the jury.


    Beyond arguing that J.W.'s "time capsule" evidence was

inadmissible, Wamala does not identify any specific

constitutional principles, nor does he cite any federal

precedent, supporting his general claim that the introduction of

17

that material denied him due process and a fair trial.  And, the court can see none.  Moreover, even if the trial court erred in admitting that evidence, there is nothing to suggest that its introduction violated Wamala's constitutionally protected rights to confrontation, due process, or a fair trial.  As the court of appeals for this circuit has observed, "To be a constitutional violation, a state evidentiary error must so infuse the trial with inflammatory prejudice that it renders a fair trial impossible."  Petrillo v. O'Neill, 428 F.3d 41, 44 n.2 (1st Cir. 2005).  No such constitutional violation occurred in this case.

II.  Federal Constitutional Claims Resolved on the Merits.

        A.    Speedy Trial (Claim 1).

        Wamala was arrested on September 12, 2006, and held in lieu of posting bail in the amount of $1 million.  Defense counsel filed a request for speedy trial on September 27, 2006.  During a hearing before the trial court on March 8, 2007, defense counsel again asserted Wamala's speedy trial rights, but simultaneously complained that the State had not provided him with the results of certain lab tests performed by the State.  Counsel acknowledged, however, that he had not filed a motion to compel. Shortly thereafter, he withdrew as Wamala's counsel.

On May 14, 2007, the court held a hearing on various pending motions.  The court noted that Wamala had new counsel and that he had filed a new motion to suppress, to which the State was entitled to respond.  Defense counsel again asserted Wamala's speedy trial rights, but the court concluded that, with a change in counsel and the recently-filed motion to suppress, Wamala was, at least implicitly, waiving his speedy trial rights.  Transcript of Motions Hearing on May 14, 2007, at 14.

In July of 2007, the court held an evidentiary hearing on one of Wamala's motions to suppress.  At that time, the court proposed to draw the jury on August 20, 2007.  Defense counsel responded, "That's fine your honor," and did not object on speedy trial grounds.  Transcript of Hearing on Pending Motions on July 2, 2007, at 5.  On August 2, 2007, the trial court conducted another hearing on various pending motions, including Wamala's motion for a bill of particulars, motion for consolidation, motion in limine, and motion to suppress.  Subsequently, on the day the court was originally scheduled to draw the jury - August 20th - the parties sought an additional hearing before the court. Specifically, the State wanted to resolve questions about whether two of the victims identified in the indictments - Wamala's other daughters, L.W. and T.W. - would comply with the subpoenas requiring them to show up for trial, whether they planned to

recant statements they had made to Nashua police officers
concerning sexual relations Wamala had with them, and whether
such contradictory testimony might implicate the girls' Fifth
Amendment rights.  Because that hearing continued until after
4:00 in the afternoon, the court postponed the jury draw until
September 4, 2007.  Transcript of Hearing on Motion to Continue
and Richards Hearing, at 83-84.  The jury was drawn on September
4, 2007, and opening statements were given the following day.

So, it was approximately one year from the date on which
Wamala was arrested until the date on which his trial began.  To
resolve his claim that the State violated his federal
constitutional right to a speedy trial, a reviewing court must
consider several factors:

> The Sixth Amendment provides that all criminal
> defendants "shall enjoy the right to a speedy and
> public trial." U.S. Const. amend. VI.  If the
> government violates this constitutional right, the
> criminal charges must be dismissed.  Strunk v. United
> States, 412 U.S. 434, 439-40 (1973).  To determine
> whether a violation has occurred, we use the four-part
> balancing test established in Barker v. Wingo, 407 U.S.
> 514 (1972), which requires a weighing of: (1) the
> length of the delay, (2) the reasons for the delay, (3)
> the defendant's assertion of his right, and (4)
> prejudice to the defendant resulting from the delay.
> Id. at 530.

United States v. Dowdell, 595 F.3d 50, 60 (1st Cir. 2010).  While
the Supreme Court has recognized that, "[d]epending on the nature

of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year," Doggett v. United States, 505 U.S. 647, 652 n.1 (1992), the question presented here is whether sufficient reasons justified the delay in Wamala's trial, including the extent (if any) to which various delays were prompted by Wamala himself.  See, e.g., RaShad v. Walsh, 300 F.3d 27, 34 (1st Cir. 2002) ("The reasons for the delay comprise the second factor in the calculus of decision.  This element seeks to ensure that courts not concentrate on the sheer passage of time without also taking account of the etiology of the delay.  The inquiry into causation involves a sliding scale: deliberately dilatory tactics must be weighed more heavily against the state than periods of delay resulting from negligence.  By like token, to the extent that valid reasons cause delay, the delay does not count against the state at all.  So too delay that is caused by the defendant.") (citations omitted).

Here, notwithstanding Wamala's repeated invocation of his right to a speedy trial, the trial court reasonably and sustainably concluded that he waived that right at the May 14 hearing.  And, at least arguably, he waived that right again at the August 20 hearing, when he (through counsel) agreed to draw the jury and begin trial later that month.  Additionally, much of

the delay in getting Wamala to trial was caused by Wamala's own
filing of pre-trial motions, several of which required lengthy
hearings, and by his apparently strategic decision not to inform
the State that two of his daughters had recanted their earlier
statements that Wamala had sexually abused them for a substantial
period of time.  See generally State's memorandum in support of
summary judgment (document no. 22-1).

   Finally, aside from the "anxiety caused by [his pre-trial]
incarceration," Habeas Petition at 12, Wamala has identified no
real prejudice stemming from the delay between his detention and
trial.  Importantly, there is no suggestion in the record that
Wamala's ability to mount a defense was, in any way, compromised
or adversely affected by the delay.  See, e.g., Rashad, 300 F.3d
at 34 ("As a general rule, the defendant bears the burden of
alleging and proving specific ways in which the delay
attributable to the sovereign unfairly compromised his ability to
defend himself.") (citation omitted).

   Considering all of the relevant factors identified in Wingo,
it is plain that Wamala's constitutionally protected right to a
speedy trial was not violated by the roughly one-year delay
between his detention and trial.  Given the complexity of this
case, the delay was not unusual.  There is no evidence that the

State engaged in any "deliberately dilatory tactics." <u>RaShad</u>,
300 F.3d 34.  And, much of that delay is directly attributable to
Wamala himself.  <u>See</u> State's memorandum at 18-21.  Finally,
Wamala has not demonstrated that he suffered any real prejudice
from the delay.  Consequently, he has failed to show that the
state court's resolution of his claims "resulted in a decision
that was contrary to, or involved an unreasonable application of,
clearly established Federal law, as determined by the Supreme
Court of the United States."  28 U.S.C. § 2254(d)(1).

    B.   Individual Voir Dire (claim 2).

Finally, Wamala claims that his First and Fourteenth
Amendment rights were violated when the trial court denied his
attorney's request to engage in individual voir dire during the
jury selection process.  But, as the state supreme court
recognized:

> The Constitution . . . does not dictate a catechism for
> voir dire, but only that the defendant be afforded an
> impartial jury.  Viewed as such, voir dire is but a
> means to achieve the end of an impartial jury.  Federal
> and state courts have held that the Legislature may
> establish reasonable regulations or conditions on the
> right to a jury trial as long as the essential elements
> of a jury trial are preserved, including number of
> jurors (12), unanimity, and impartiality.  Therefore,
> there is no constitutional right to any particular
> manner of conducting the voir dire and selecting a jury
> so long as such limitations as are recognized by the

> settled principles of criminal law to be essential in
> securing impartial juries are not transgressed.

State v. Wamala, 158 N.H. at 594 (citations and internal

punctuation omitted).


Applying those principles to Wamala's case, the court

concluded that the jury selection process employed by the trial

court violated neither Wamala's state nor his federal

constitutional rights.  Again, nothing in Wamala's habeas

petition, or in the state supreme court's opinion itself,

suggests that the court's resolution of Wamala's claim "resulted

in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by

the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

See generally Ristaino v. Ross, 424 U.S. 589, 594-95 (1976)

("Voir dire is conducted under the supervision of the court, and

a great deal must, of necessity, be left to its sound discretion.

This is so because the determination of impartiality, in which

demeanor plays such an important part, is particularly within the

province of the trial judge.") (citations and internal

punctuation omitted); Morgan v. Illinois, 504 U.S. 719, 729-30

(1992) (holding that the Constitution does not mandate any

particular form of jury voir dire; it merely requires that a

criminal defendant be tried before an impartial jury).

24

## Conclusion

For the forgoing reasons, as well as those set forth in the State's memorandum, Wamala's petition for a writ of habeas corpus (document no. 1) is denied.  The State's motion for summary judgment (document no. 22) is granted.

Because Wamala has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability. Petitioner may, however, seek such a certificate from the court of appeals under Federal Rule of Appellate Procedure 22(b).  See Rule 11, Federal Rules Governing Section 2254 Cases (2010); 28 U.S.C. § 2253(c).

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

January 28, 2011

cc:  Severine Wamala, pro se
     Elizabeth C. Woodcock, Esq.

25